```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

NORTHERN METROPOLITAN FOUNDATION FOR
HEALTHCARE, INC., NORTHERN MANOR
MULTICARE CENTER, INC., and NORTHERN
MANOR ADHCP,                                    MEMORANDUM & ORDER
                                                20-CV-2224(EK)(JAM)
                    Plaintiffs,


            -against-

RSUI INDEMNITY COMPANY,

                    Defendant.

-------------------------------------x
```

ERIC KOMITEE, United States District Judge:

This case involves a dispute between a company that successfully defended a recent *qui tam* action in this court, on the one hand, and its insurance company, on the other. Plaintiff Northern Manor owned and operated adult day health care centers in Brooklyn. Northern earned most of its revenues from Medicaid reimbursements. In the *qui tam* action at issue, a group of relators argued that Northern had defrauded the federal and New York State governments in submitting claims for reimbursement.

RSUI Indemnity — the defendant here — had written Northern's Directors and Officers Liability Policy. Northern now seeks a declaratory judgment confirming that the policy obligates RSUI to cover fees and expenses Northern incurred in

defending the *qui tam* action.  RSUI declined to pay for that defense, arguing that the policy's coverage is substantially limited by a provision covering the defense of actions involving "Government Funding."

That provision appears in an endorsement attached to the underlying policy.  It provides that the definition of "Loss" under the policy "shall not include the return of funds which were received from any federal, state or local governmental agency."  Instead, it sets up an alternative coverage structure for "any Claim arising out of the return, *or request to return*, such funds."  As discussed below, that alternative structure provides substantially less coverage than the policy provides for losses generally.

The sole issue in this case is whether the relators' *qui tam* action constituted a "Claim arising out of the . . . request to return" "funds which were received from any federal, state or local governmental agency."  The parties have cross-moved for summary judgment.  For the reasons that follow, Northern's motion is granted and RSUI's is denied.

## I. Background[1]

**A. The *Qui Tam* Action**

In 2016, a group of *qui tam* relators sued Northern, their former employer. They brought eleven claims: five under the federal False Claims Act (the "FCA"), five under New York State's equivalent statute, and one for employment discrimination and retaliation under New York City's Human Rights Law. Relator's Second Amended Compl. ("*Qui Tam* Complaint"), ¶¶ 228-291, No. 13-CV-4933, ECF No. 55. Judge Brodie — to whom the case was originally assigned — dismissed the employment discrimination and retaliation claim on summary judgment, leaving only the federal and state *qui tam* claims. *United States ex rel. Lee v. N. Metro. Found. for Healthcare, Inc.*, No. 13-CV-4933 (MKB), 2019 WL 1597296, *21 (E.D.N.Y. Apr. 14, 2019).[2]

The relators' core contention was that Northern had discriminated against its non-Russian clients in operating its facilities. *United States ex rel. Lee v. N. Metro. Found. for Healthcare, Inc.*, No. 13-CV-4933 (EK), 2021 WL 3774185, at *2

---

[1] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including the parties' Local Rule 56.1 Statements. The Court also takes judicial notice of publicly available court documents in the underlying *qui tam* action.

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

3

(E.D.N.Y. Aug. 25, 2021). This violated the FCA, the relators claimed, because when Northern submitted claims for Medicare and Medicaid reimbursement, it omitted to inform the agencies of "its violations of statutory, regulatory, or contractual requirements." *Id.* The relators argued that the agencies would not have paid Northern's claims if they knew of the alleged discrimination. *Id.*

The relators' complaint set out the specific remedies they sought for the *qui tam* claims. *Qui Tam* Complaint at 56-57. These included "treble the United States' damages;" "an $11,000 penalty for each false or fraudulent claim;" "the [r]elator's share pursuant to 31 U.S.C. § 3730(d)(1) or (2);" and "costs and attorney's fees pursuant to 31 U.S.C. § 3730(d)." *Id.*

The federal and state governments declined to intervene, leaving the relators to pursue the false-claims allegations on their own.[3] *U.S. ex rel. Lee*, No. 13-CV-4933, ECF Nos. 9-10. The case proceeded to a bench trial. *U.S. ex rel. Lee*, 2021 WL 3774185 at *1. Following the relators' case-in-chief, this Court dismissed the case under Rule 52(c) for failure to establish the FCA's materiality element. *Id.; see*

---

[3] New York State had brought a case alleging different violations against Northern; the parties reached a $6.5 million settlement agreement in that case in August 2014. Press Release, Office of the New York Attorney General, *A.G. Schneiderman Announces Four Arrests and $6.5 Million Settlement for Medicaid Fraud at Brooklyn Adult Day Health Care Facility* (Aug. 12, 2014).

4

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) (discussing relators' obligation to prove materiality). The Second Circuit subsequently affirmed the dismissal. *Lee v. Northern Metro. Found. for Healthcare, Inc.*, No. 21-2155, 2022 WL 17366627 (2d Cir. Dec. 2, 2022).

## B. The Insurance Policy

Under the applicable policy, RSUI had a general duty — outside the "Government Funding" context — to cover "all Loss" incurred by Northern (and some employees). Insurance Policy at 46, ECF No. 26-7.[4] "Loss" was defined broadly to include "damages," "settlements," and "judgments," as well as "Defense Expenses." *Id.* at 48. Defense expenses included the "reasonable and necessary legal fees and expenses incurred, with the Insurer's consent, by any Insured in defense of a Claim." *Id.* at 47.

RSUI was to reimburse Northern for its losses and defense expenses only after Northern had paid out the "applicable Retention" amount — effectively a deductible. *Id.* at 14. As the reference to the "applicable Retention" amount implies, the policy contained multiple retention amounts. *See id.* at 31. Some of these were fairly low; the retention amount for third-party discrimination claims, for example, was only

---

[4] When citing to the policy at ECF No. 26–7, this order adopts the ECF pagination rather than the native pagination.

$50,000. *Id.* at 39; *see also id.* at 37 (retention amount for wage and hour claims was $50,000).

Coverage for "Government Funding" claims worked differently. First, the relevant endorsement excluded the "return" of government funds from the policy's definition of Loss: "Loss shall not include the return of funds which were received from any federal, state or local governmental agency." *Id.* at 18. (This presents no problem for Northern, as the company did not lose a judgment in the underlying *qui tam* case.) Second, the endorsement set up a high retention amount for the *defense* of Government Funding claims — $1 million — and required the insurer and insured to share any defense expenses above that amount on a 50 / 50 basis. *See id.* (providing that "with respect to any Claim arising out of the return or request to return, such funds, and subject to a Retention amount of $1,000,000 the Insurer shall pay Defense Expenses up to a total of $1,000,000 incurred by the Insured on a fifty percent (50%) coinsurance basis").

The upshot was that in defending a government funding claim, Northern would bear the first million dollars in defense expenses and half of all defense expenses above that first million. Northern's defense expenses in the *qui tam* action have not exceeded that $1,000,000 retention. Pl. Response to Def. 56.1 Statement ¶ 39, ECF No. 31.

6

The parties dispute whether the Government Coverage Provision applies to limit coverage of Northern's defense expenses in the underlying action — specifically, whether the relators' *qui tam* claims arose out of a "request to return" funds Northern received from a governmental agency.

## II.  Legal Standards

Summary judgment is appropriate under Rule 56 when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017).  The moving party has the burden of demonstrating the absence of a dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When resolving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017).

The "[i]nterpretation of an insurance policy presents a question of law appropriately decided on a motion for summary

7

judgment." *Vam Check Cashing Corp. v. Fed. Ins. Co.*, 787 F. Supp. 2d 264 (E.D.N.Y. 2011), *aff'd*, 699 F.3d 727, 729 (2d Cir. 2012).

### III. Discussion

New York law governs the interpretation of the insurance policy at issue.  Insurance Policy at 54; Complaint ¶ 9, ECF No. 1.  Under New York law, "[i]f the provisions [of an insurance contract] are clear and unambiguous, courts are to enforce them as written." *Village of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). "However, if the policy language is ambiguous . . . the ambiguity must be interpreted in favor of the insured" — here, Northern.  *Id.*

The parties dispute whether the Government Funding Defense Expense Coverage provision (the "Government Funding Provision") unambiguously applies to the defense expenses at issue here.  "Ambiguity exists when a contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, uses and terminology as generally understood in the particular trade or business." *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005).

8

Insurance policies under New York law are read to "give the words of the agreement their ordinary and plain meaning." *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992); *see also Lavanant v. Gen. Accident Ins. Co. of Am.*, 79 N.Y.2d 623, 629 (1992) ("Unambiguous provisions of a policy are given their plain and ordinary meaning."). Under its ordinary meaning, "return" connotes putting the original owner of property back in its prior position. "Return" means "sending . . . a thing back to the . . . owner," or "to bring, send, or put back to or in a former position." *Golden Unicorn Enters., Inc. v. Audible, Inc*, 682 F. Supp. 3d 368, 376 (S.D.N.Y. 2023) (collecting dictionary definitions).[5]

That definition does not encompass the relators' *qui tam* claims, which sought to do more than put the government "back to or in a former position." *Id.* Rather, the relators explicitly requested "*treble* the United States' damages," plus "an $11,000 penalty for each and every false or fraudulent claim," accompanied by attorney's fees and the "relator's

---

[5] RSUI proffers substantially similar definitions: "revert" and "to pass back to an earlier possessor." Defendant's December 15 Letter ("Def. Dec. 15 Ltr.") at 2, ECF No. 47.

share," as provided for by 31 U.S.C. § 3730(d)(1)-(2).  *Qui Tam* Complaint at 56.

And it goes without saying that the relators themselves — the claimants here — were never in the "former position" of possessing any of the money for which they sued. If the word "return" contemplates a transfer back to the property's original "owner," as discussed above, then it might be natural to conclude that an FCA suit *by the federal government* was a claim for the return of funds.  Here, however, the federal and state governments declined to intervene, and thus made no claim of any kind.  In those circumstances, it would strain the language of RSUI's endorsement to say that the *qui tam* relators' claims in this court arose out of a request to "return" funds.

Supreme Court precedent supports the notion that an FCA claim is about more than the return of government funds. The Court has counseled that the FCA's treble damages multiplier is both compensatory *and* punitive.  *Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 130 (2003).  An earlier decision described the FCA damages regime as "essentially punitive in nature."  *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000).  The Ninth Circuit has similarly observed that the FCA's damages provisions serve a dual purpose: they "deter future fraudulent claims, as well as [] recoup the

10

government's losses due to fraud." *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991). Thus, the claims at issue in the underlying litigation here were about far more than the return of funds, if the notion of "return" is even properly implicated at all.[6]

RSUI argues that because the damages award is calculated by *reference* to the "United States' damages" (i.e. by tripling them) the complaint sought the return of funds. In support, RSUI points to a decision from the Northern District of Georgia. There, the district court analyzed a virtually identical insurance provision: the policy limited coverage of defense costs incurred on claims "arising out of the return, or request to return [] funds." *SavaSeniorCare, LLC v. Starr Indemnity & Liability Co.*, No. 18-CV-1991, 2021 WL 4429088, at *2 (N.D. Ga. Sept. 27, 2021) (hereinafter *Sava*). Sava, like Northern, was the subject of False Claims Act claims. *Id.* at *3. The company argued, as Northern does, that the provision at

---

[6] Separate and apart from the FCA, there is a mechanism for the straightforward return of funds to Medicare and Medicaid. As RSUI acknowledges, Center for Medicare and Medicaid Services ("CMS") can seek "the return of any improper payments made to providers." Def. Dec. 15 Ltr. at 3 (citing CMS Recovery Auditing Fiscal Year 2016; Report to Congress, available at https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-ffs-compliance-programs/recovery-audit-program/downloads/fy-2016-medicare-ffs-report-congress.pdf (last visited September 22, 2024)). That program — the Medicare Fee-for-Service Recovery Audit Program — allows CMS to identify overpayments and send demand letters requesting the return of specific amounts. *See* 42 C.F.R. 455.500-455.518, Subpart F ("Medicaid Recovery Audit Contractors Program").

11

issue did not "expressly exclude coverage for claims arising under the FCA." *Id.* at *6.

The court rejected Sava's arguments, holding that the provision "applies to any processes and claims the government might use to obtain the return of funds — such as FCA claims." *Id.* at *7. The *Sava* decision is distinguishable, however, because the federal government actually intervened and filed its own complaint in that action.[7] Thus, according to the *Sava* court, "[r]egardless of the name applied *by the government* to the relief it sought in the FCA Actions, *it* was attempting to recover funds paid to Sava because of Sava's alleged Medicare fraud." *Sava*, 2021 WL 4429088 at *7. (emphases added). The court addressed the civil penalties and treble damages sought under the FCA only in passing, dismissing them in one sentence: they are simply "fines and penalties 'arising out of' the government's efforts to obtain the return of the wrongfully paid funds." *Id.*[8]

---

[7] The first sentence of the government's complaint states that the *Sava* case was brought "to recover millions of dollars that Sava caused the Medicare program to pay." *SavaSeniorCare, LLC v. Starr Indemnity and Liability Co.*, No. 18-CV-1991, ECF No. 225-9 (the "Government's *Sava* Complaint"), at 2 (N.D. Ga. 2020).

[8] A decision from the Superior Court of Pennsylvania also analyzes a similar contractual provision, but the decision is ultimately unhelpful, because its holding is based exclusively on Pennsylvania equitable principles. *Southcentral Emp. Corp. v. Birmingham Fire Ins. Co. of Pennsylvania*, 926 A.2d 977, 979 (Penn. Sup. Ct. 2007). The Superior Court held that because "Southcentral was not legally entitled to keep [the government] funds, their return can hardly be deemed a 'loss' for insurance purposes," regardless of the definition of loss in the contract itself. *Id.*

12

A second distinction is that the United States' complaint in *Sava* included a claim for unjust enrichment, which is squarely concerned with the return of property to its rightful owner.  Government's *Sava* Complaint at 47-48.  The government alleged that Sava was "unjustly enriched at the expense of the United States."  *Id.* ¶ 207.  The explicit demand that Sava return funds to the government may explain why the *Sava* court devoted less attention to the civil penalties and treble damages sought.  Here, we face a different landscape: demands from a private party for multiplied damages, statutory penalties, and the relators' share.

\*     \*     \*     \*     \*

For these reasons, the language of the endorsement cannot be read to apply.  And to the extent there is any ambiguity in this reading, that, too, redounds to Northern's benefit.  "Ambiguity [in an insurance policy] must be interpreted in favor of the insured."  *Village of Sylvan Beach, N.Y.*, 55 F.3d at 115.  The relators in this case sought a judgment vastly exceeding any amount they alleged was falsely obtained from the government.  At the very least, the meaning of the endorsement is ambiguous in its application here.  In that circumstance, New York law requires that it be interpreted in Northern's favor.

---

at 982 ("[A] 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain.").

## IV.  Conclusion

For the foregoing reasons, the Court grants Northern's motion for summary judgment and denies RSUI's cross-motion.  The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

     /s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:   September 23, 2024
         Brooklyn, New York